1
2
3
4
5
6
7
8                        IN THE UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL R. SCOTT,

11              Petitioner,                    No. CIV S-07-cv-2729 LKK JFM (HC)

12         vs.

13   M.C. KRAMMER, Warden,

14              Respondent.                    FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner, a state prisoner proceeding pro se, has filed an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  On February 6, 2003, petitioner was convicted in

18   Sacramento County Superior Court on the following: three counts of attempted murder (Cal.

19   Penal Code §§ 664/187(a) (counts I-III)); three counts of assault with a firearm (Cal. Penal Code

20   § 245(a)(2) (counts IV-VI)); and sustained firearm allegations (Cal. Penal Code § 12022.53(c)

21   (counts I-III) and § 12022.5(a) (counts IV-VI)).  (Resp't's Lodgment (hereinafter LD) 1 at 702-

22   07.)  With the addition of sentence enhancements for the use of a firearm (Cal. Penal Code

23   §§ 12022.53 & 12022.5), petitioner was sentenced to twenty-seven years.  (LD1 at 784.)

24              In the petition now pending before this court, petitioner seeks habeas relief on the

25   grounds that (a) the prosecutor's peremptory strikes of African-Americans from the jury panel

26   were based on race in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986); (b) the prosecutor's

                                             1

1  peremptory strikes of the African-Americans from the jury panel violated those jurors' equal

2  protection rights, as protected by the Fourteenth Amendment; and © the trial court's failure to

3  give a jury instruction on the defense of unconsciousness violated petitioner's due process rights

4  and right to a fair trial.  (Pet. at 1, 24 and 29.[1])  Upon careful consideration of the record and the

5  applicable law, the undersigned recommends that petitioner's application for habeas corpus relief

6  be denied.

7                                PROCEDURAL BACKGROUND

8              On April 28, 2006, the California Court of Appeal for the Third Appellate District

9  issued a reasoned opinion affirming petitioner's conviction and sentence.  (LD8.)

10             On June 1, 2006, petitioner filed a petition for review to the California Supreme

11 Court which was denied on August 16, 2006.  (LD9-10.)

12             On December 18, 2007, petitioner, proceeding pro se, filed a petition in the

13 instant action.  On June 17, 2008, respondent filed an answer.  Petitioner did not file a traverse.

14                                FACTUAL BACKGROUND

15             The following facts are obtained from the decision of the California Court of

16 Appeal, Third Appellate District, in which petitioner's conviction was upheld:

17             There is no dispute that on March 18, 2002, [petitioner's friend]
             McPherson drove Scott's Cadillac to downtown Sacramento, near the Hard Rock
18           Café; Scott got out and then fired several shots from a revolver, causing a group
             of men to scatter for cover; one bullet scratched victim Benyelle Jones's arm.
19           The trial centered on the knowledge and intentions of the defendants.

20             K Street is a pedestrian shopping street to the east of Seventh Street; west
             of Seventh Street it becomes a two-story mall.  At K, Seventh is a one-way street,
21           heading south.  One facing the mall sees the Hard Rock Café on the right and a
             state building on the left.  Further down Seventh to the left (south) one finds a bus
22           stop and then an alley with a parking lot between the state building and the
             Marshall Hotel, situated on the corner of Seventh and L Streets.
23
24             Several witnesses testified that at about 8 p.m. a Cadillac pulled up by the
             mall entrance and backed up several feet, remaining in a lane of traffic; Scott got

25

26  ───────────────
    [1]  Petitioner attaches his arguments to the petition.  Accordingly, references herein will be
    to the attached brief.

                                          2

out and fired shots towards a group of about six men.  Jones testified Scott said "Don't I know you all" before firing.  Jones also testified Scott fired the first shot up into the air.  Witnesses counted five to six shots fired.  Contrary to Jones's testimony, a teenage boy testified Scott's hand was parallel to the ground when he began firing directly into the group of men, one shot after another.  The boy's father testified Scott fired parallel, "pointed at the crowd of people" about 10 to 12 feet in front of Scott.  Scott moved his arm from left to right as he fired.  Two other bystanders testified Scott began firing level. Fresh marks on a pillar and two planters corroborated testimony that Scott fired at least some shots parallel to the ground.  Jones and another witness saw defendants in the alley or leaving the mall before the shootings.

Two of the witnesses followed the Cadillac to West Sacramento and flagged down a peace officer; shortly thereafter Scott was seen leaving a convenience store with some beer, first nearing but then walking away from his car, as a patrol car approached; McPherson was in the car with the engine running, but he then parked and left on foot.

When arrested, Scott lied to Officer Shim, stating that he had not been at the mall or fired a gun and did not have a gun in the car; when Shim showed Scott a revolver another officer found in the car, Scott said "You found it, huh?"

After he spoke with Officer Shim, Scott was in the back of the patrol car for about five minutes, then told Officer Navarrette that he wanted to explain his story.  In his own testimony Scott said he had had time to calm down and wanted to tell Navarrette the truth, but, as will be seen, his story to Navarrette differed from his trial testimony.  Scott told Navarrette that he was talking to some "girls" by the bus stop when he was approached by six or seven "dudes," including one he recognized "because he beat him up the week prior."  The man wore a red bandanna and said, "What's up blood? . . . I'm going to kick your butt" and he "was going to get an A.K. and his homies at the time."  Scott told the officer he fired his gun into the air in self-defense, but could not remember how many shots he fired because he was so frightened, but it may have been three or four.  Scott "said he wasn't trying to shoot at the crowd because he wasn't crazy like that."  Scott said, "The gun is gone," but Navarrette found it under the dashboard, closer to the driver's side of the car.  Scott said, "Officer Nakata knows the guy[s] I shot at[,]" and he named "Jamari and Rasheem."

At trial Scott testified that about two years before trial he had moved to Sacramento after he had been shot in the head in Texas and spent a couple of months in a hospital.  He described an incident at the Welcome Grove Motel in West Sacramento which took place on March 2, 2002.  His version was that he had been visiting Cory Gail (McPherson's brother, sometimes spelled "Corey") and Lajina Champion, who lived at the Welcome Grove.  He quarreled with "Marcus" (later referred to at trial as "Arthur Harris") over a woman named "Toya" and punched Marcus, knocking him down.  Jones and an unnamed third man were present when Scott struck Marcus.  Later, Marcus threatened Scott and - in Jones's presence - Marcus and the third man shot at Scott, hitting the Cadillac a few times.  Because of this incident, Scott bought a gun and ammunition.

/////

Scott testified that on the night of the instant offenses he and McPherson (whom he called "Bishop") spent a couple of hours with some "girls" at a Motel 6, then went to the Welcome Grove to visit his friend Tasha; McPherson drove Scott's car that day.  A friend known only as "Chuckie" said he wanted to buy marijuana; after the three men spent about 30 to 45 minutes with Tasha, Scott, McPherson and Chuckie went to Seventh and K, where Scott and McPherson often bought marijuana from "Little Blunt" by the bus stop in front of the state building.  McPherson drove, with Scott as the front passenger and Chuckie in the back.

Scott testified McPherson stopped the car, *past the mall entrance and without backing it up* when Scott told him "let me holler at these girls real quick." He also testified that the two witnesses who had testified they had seen him or the car near the mall earlier that evening were mistaken.  Scott got out and spoke to some women for about a minute when a group of men approached.  Scott recognized Marcus (who wore a red bandanna), Jones and the third man from the Welcome Grove incident, and Marcus said, "What's up, Blood . . . we're going to get you now."  Scott also recognized Jamari and Rasheem.  When Scott saw Marcus pull down his bandanna Scott thought to himself, "Dang, that's the dude that's shot at me and that I punched[;]" "I was stuck right then, I was nervous . . . I was just like, Dang."  The girls walked away but Scott did not because he was "kind of shell-shocked" and he "froze."  When he saw Marcus reach near his waistband, Scott displayed his gun, which caused two men to run off, though the others were "steadily approaching me."

Scott testified he fired once into the air and then "was kind of freaked out" "in a state of shock," and did not remember how many other shots he fired.  He remembered seeing Marcus run away to the west and remembered Jamari, Rasheem and Jones leaving, but he was not focused on them.  His only intent had been to scare the men, to protect himself.

After Scott "stopped hearing gunshots" he ran back into his Cadillac and told McPherson "Let's go."  They drove to West Sacramento, dropped Chuckie off at the Welcome Grove, then went to the convenience store "to get something to drink."  He testified he had lied to Officer Shim because he was still scared.

On cross-examination Scott conceded the gunshot to his head had not caused brain damage or affected his thinking.  He often bought marijuana by the bus stop from Little Blunt and never had trouble, though he had said he did not carry his gun except when he thought there might be trouble.  Although it was Chuckie who wanted to buy marijuana, only Scott got out of the Cadillac.  He denied saying anything like, "Don't I know you all" to the group.  His only two friends in Sacramento were McPherson and Cory, whom he sometimes called "Little Bro" and "Big Bro," respectively.  He claimed he never told McPherson about the gun, even though McPherson and his brother Cory were his only friends and he had McPherson drive his car often.  He testified he had not mentioned Marcus to Officer Navarrette because all of the men in the group were in his mind when he gave his statement, but he conceded he had never had prior trouble with Jamari or Rasheem, the two men he did name.  (RT 985-986)

/////

4

He did not mention the Welcome Grove shooting because Navarrette never asked him why he was scared; nor did he mention Marcus putting his hand toward his waist. (RT 986-991)  Scott admitted he lied to West Sacramento officers about the Welcome Grove shooting, in that he only mentioned Marcus and the third man, not Jones, and he had told them *Cory* and Marcus had quarreled the day *before*, rather than telling them *he* and Marcus had quarreled the day of the shooting.

When asked by the prosecutor if he had "black[ed] out," Scott said he was "freaked out" and thought, "I'm going to die or I'm going to get to the car or I'm going to get away from here, you know."  When asked if he had fired parallel to the ground Scott testified he did not remember anything after the first shot until "after I hear the shots stop" and he saw that the group had run away.  On redirect Scott testified that "as I was shooting . . . it was kind [of] a blank out, something like that;" "it was a reaction to me knowing . . . I got to get away from here, you know."  "[M]y mind state wasn't even stable enough . . . to focus on shooting any particular person . . . ."

McPherson testified he did not circle the block or go by the alley behind the Marshall Hotel before stopping *at the curb* to allow Scott to get out of the Cadillac.  He claimed he was on his mobile telephone with a girlfriend, heard shooting, then pulled away when Scott got back into the car.  He admitted leaving the engine running and admitted he might have backed the car up but he did not remember doing so.  He had never seen Scott with a gun and had nothing to do with the shooting.  On cross-examination he testified it was his brother Cory's mobile telephone and he could not remember the number, and he did not know his former girlfriend's last name.  As pointed out by the prosecutor during argument, McPherson did not offer the girlfriend's or Chuckie's testimony to corroborate his account.  McPherson denied being at the Welcome Grove shooting.

In rebuttal the prosecutor introduced evidence that the prior shooting at the Welcome Grove was started by persons associated with defendants, possibly Gabriel Cranshaw ("P-Low") and McPherson, and that Marcus returned fire in self-defense.  Although McPherson testified he had last smoked marijuana about a year before the instant offenses, a blood sample drawn several hours after the mall shootings indicated McPherson had used marijuana that day.  The prosecutor also introduced evidence from gunshot residue testing, which indicated that Scott had recently fired a gun which showed McPherson had some lead particles on his hands, which would be consistent with handling a gun or possibly touching Scott's hands after Scott fired a gun.

The parties stipulated that Jones previously testified that when Scott got out of the car by the mall, Jones heard someone close by say, "That's the guy that broke my jaw."

The operative information charged seven premeditated attempted murders, with firearm allegations.  The jury rejected all allegations of premeditation, convicted only of the lesser offense of assault with a firearm in counts IV-VI, and acquitted defendants completely on count VII.

(LD8 at 2-9 (emphasis in original).)

ANALYSIS

I.  <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable  determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result.  <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (<u>citing</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  <u>Williams</u>, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 76 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks to the last reasoned state court decision as the basis for the state court judgment.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002).

6

II.  Petitioner's Claims

    A.  Batson Motions

        Petitioner alleges that his conviction should be vacated because the prosecutor exercised peremptory challenges to strike five African American jurors on the basis of a presumed group bias, in violation of Batson v. Kentucky, 476 U.S. 79 (1986).

        1.  Factual Background

            I.  The Challenged Jurors

        During voir dire, prospective jurors were asked questions by the trial court, defense counsel and/or the prosecutor related to responses provided on a juror questionnaire.  At issue in this petition are responses to two questions from that questionnaire, Questions 40 and 41, which read:

        40.  In general, do you feel that African Americans are treated fairly or unfairly by law enforcement in Sacramento?

          FAIRLY ___    UNFAIRLY ___

        41.  Do you feel that African American males:

          A.  Are unjustly accused of committing more crimes than other persons?
              YES ___   NO ___
          B.  Are more likely to commit crimes than other persons?
               YES ___   NO ___
          C.  Are treated as fairly by law enforcement as other persons?
               YES ___   NO ___
          D.  Are treated fairly by the judicial system as other persons?
               YES ___   NO ___

(LD3 at 2065.)

           a.  David Cusic

        During initial questioning by the trial court, Mr. Cusic stated he was arrested by West Sacramento police officers in 1998 for domestic violence, though no charges were filed against him.  (LD4 at 1054-55.)  He felt that the police were overzealous in their response to the domestic violence dispute, but assured the court that the incident would not impair his ability to

1    be a fair and impartial juror in the case.  (Id. at 1055.)  Upon questioning by the prosecutor

2    regarding his answer to Question 40 of the juror questionnaire, Mr. Cusic stated "I think that

3    sometimes they, the Police Department, if they just see an African-American, they automatically

4    assume the worst.  That's how I feel about that."  (Id. at 1058.)  Mr. Cusic then relayed a story in

5    which he felt he was pulled over by a West Sacramento police officer because of his race.  (Id. at

6    1059.)  When asked by the prosecutor whether he could put aside those incidents while sitting as

7    a juror in the present trial, Mr. Cusic responded "I don't think so.  I cannot promise you anything

8    like that."  (Id.)  When asked for an explanation, Mr. Cusic stated "Because of the experience I

9    had with the police."  (Id.)  Even so, Mr. Cusic again assured the court that he would put aside

10   his experiences in order to be fair.  (Id. at 1060.)  During peremptory challenges, the prosecutor

11   excused Mr. Cusic.  (Id. at 1086.)

12                                    b.  Angela Harris

13           In response to the trial court's query as to whether any juror has had "a

14   particularly good or particularly bad experience with a law enforcement official," Ms. Harris

15   stated that her brother, who is a rapper, has been repeatedly stopped by Oakland police officers

16   while "just driving down the street [doing] nothing."  (LD 4 at 1101-02.)  Ms. Harris, however,

17   stated that she did not think that all officers were unprofessional and that she would judge any

18   testifying officers by the same standards as for any other witnesses.  (Id. at 1102.)

19           During an examination outside the presence of the other prospective jurors, the

20   trial court asked Ms. Harris a question regarding her response to Question 40 of the juror

21   questionnaire:

22           The Court:   . . . [Y]ou checked unfairly.  And then you said some
             African-American males or females might have had a past or trying to change
23           sometimes . . . it does not work in Sacramento or any other county for that matter.

24                        What did you mean by that?

25           [Ms. Harris]:    Um, for instance, I have a 5.0.  I don't really drive it that
             much, but on certain occasions, like, well, in the summer time, I've drove [sic] it
26           maybe ten times, I would go pick my cousins up in West Sacramento and I know

                                              8

I don't drive fast but that's a fast car and it would seem like every time I would go entering into West Sacramento, a police would get behind me and just pull me over for nothing, make we go through the whole registration, license, insurance thing and then say that I might have didn't use my blinker or my taillight might have been out when I know that they was working and then they ask me to remove myself from the car and I go back and look at it and the lights are working there's nothing wrong with it.  Nothing's broke.  Nothing's wrong.

The Court:    So you feel there was no basis at all for them to have stopped you?

[Ms. Harris]:    Exactly.

(LD4 at 1116-17.)  Notwithstanding this testimony, Ms. Harris again assured the court that she

would apply the same standards to the testimony of law enforcement officials as any other

witnesses.  (LD4 at 1118.)

Ms. Harris was then questioned the prosecutor.  (See LD4 at 1119-20.)

[Prosecutor]:    . . . [Y]ou're talking about something that doesn't work.  You say it just does not work in Sacramento or any other county for that matter.  What are you referring that doesn't work?

[Ms. Harris]:    From the other county, well, my brother's a rapper, he's a known rapper.  And I just feel that because he's African-American, he's stereotyped by, by the, I mean, his car is probably known so the police that are in Oakland, California, they know that car and it don't matter whoever driving it they pull it over.  It could be my father and he's 76 and they'll still pull the car over.

[Prosecutor]:    Is it, does your feeling about that issue extend to the way the criminal justice system treats African-Americans, you know, such as courts and . . .

[Ms. Harris]:    Sometimes I feel that it is unfair.  But I can put that aside to do what I know that's right.

[Prosecutor]:    Okay, I mean, because you can imagine what my concern would be?

[Ms. Harris]:    Be biased.

[Prosecutor]:    Counter balance that by going into the jury room and sort of taking that personal belief and making sure –

[Ms. Harris]:    No, I wouldn't do that.

[Prosecutor]:    Okay, you think you could be fair and impartial in this case?

9

1    [Ms. Harris]:    Yes.

2    (LD4 at 1119-20.)  During peremptory challenges, the prosecutor excused Ms. Harris.  (Id. at

3    1164.)

4                                c.   Linda Terrell

5    During voir dire by defense counsel, Ms. Terrell expressed her opinion that, based

6    on events that she personally saw, she thought African-Americans were treated unfairly at times

7    by law enforcement.  (LD4 at 917-18.)  Upon further questioning by the prosecutor on this issue,

8    Ms. Terrell explained that while attending a county fair, she observed young African-American

9    males approached by police officers in a manner that Ms. Terrell thought was more aggressive

10   than necessary.  (Id. at 929.)  The prosecutor asked whether she could hear the present case

11   without wanting to "cut [the defendants] a break" based on her past observations  (Id. at 930.)

12   Ms. Terrell stated, "Well, at this point, no, I don't plan to.  [¶]  I plan to give it a, you know,

13   listen, but sometimes things can be said that kind of reflect back, but I don't plan to have that

14   type of approach."  (Id.)

15            [Prosecutor]:    What do you mean by that, things can be said?

16            [Ms. Terrell]:    I mean, someone can testify and say, you know, that they
                 were approached a certain way and automatically, you know –
17
               [Prosecutor]:    Okay.
18
               [Ms. Terrell]:    – that could come to mind.
19
     (LD4 at 930.)
20
               Ms. Terrell was also questioned by the prosecutor about her prior experience as a
21
     juror.  (See LD4 at 931-33.)  Because of that experience, Ms. Terrell stated that she learned "[t]o
22
     really think harder."  (LD4 at 931.)  When asked what she meant, Ms. Terrell said she thinks she
23
     could have given some more thought to certain testimony:
24
               [Prosecutor]:    Was that an issue that came up in your prior jury service
25                  or . . .

26   /////

10

1    [Ms. Terrell]:    Um . . . it was a [*sic*] issue that, yes, in my mind that someone had made a statement and I kind of really didn't give it thought either
2    way and I thought maybe if I thought hard about it maybe I would have questioned it more.

3

4    [Prosecutor]:    So, in other words, while you were in deliberations, there was a piece of evidence, a testimony of a witness and you sort of accepted that at
     face value.  I assume you were with other jurors in accepting it.  And then as you
5    thought about it later, you sort of thought, you know, I'm not sure whether I should have just accepted it the way I did?

6

7    [Ms. Terrell]:    Right.  But it was mainly one of the jurors who had said something.  And it was because at the end, it was kind of personally about
     themselves that they made a statement.

8

9    [Prosecutor]:    Something that happened – let me ask you this: This happened in the deliberations process?

10   [Ms. Terrell]:    Right.

11   (Id. at 931-32.)  Ms. Terrell, however, said that she thought the jury system worked and that she

12   wouldn't allow whatever occurred during those previous deliberations to affect the present case.

13   (Id. at 933.)  During peremptory challenges, the prosecutor excused Ms. Terrell.  (Id. at 1304.)

14                                    d. Louis Gorham

15   During questioning by the trial court, Mr. Gorham recounted a story in which he

16   had been subject to racial profiling while living in Merced by a police officer.  (LD4 at 1099-

17   1100.)  Despite that experience, Mr. Gorham stated that he felt the incident was specific to the

18   officer who profiled him.  (Id. at 1100-01.)  He also said that he had a nephew who was stabbed

19   to death in New Orleans, but did not think that the incident would affect his ability to hear the

20   present case.  (Id. at 1109.)

21   Upon further questioning by the trial court in regard to Mr. Gorham's answer to

22   Question 41 on the juror questionnaire, the following exchange occurred:

23   [Mr. Gorham]:    I think pretty much that black persons are targeted for some
     reason or other.
24
25   The Court:    And, Mr. Gorham, let me ask you the next question.  Obviously, in
     this instance, the two defendants are African-American males.  Can you put aside
     whatever personal beliefs you may have and decide this case by the evidence that will be
26   presented here and the law as I will instruct you?

[Mr. Gorham]:    I didn't answer the question like that to make a statement with that.  Yes, I could.

The Court:    So you can block out whatever personal opinion you may have and decide this case on what will be presented here in this courtroom?

[Mr. Gorham]:    Absolutely.

(LD4 at 1114.)

Defense counsel followed up on the line of questioning introduced by the court:

[Defense counsel]:    Is your feeling on this issue based on the fact that you were profiled on that one occasion as an African-American or is that from other experiences?

[Mr. Gorham]:    Well, I'm black and I see what goes on in the neighborhoods and I read the newspapers, you know, you go to jail, and who's there? It's all black people.  And I'm afraid that everybody is just considering them as being, you know, the scapegoat for a lot of things.  It's a personal opinion, okay, I think that quite possibly on the lower economic side of it that, yes, there may be more crimes that are done by black people, but I do think that they are scrutinized a little bit more than, say, an average white person.

(LD4 at 1114-15.)

The prosecutor also questioned Mr. Gorham on the same issue:

[Prosecutor]:    Mr. Gorham, I totally appreciate your opinion on this.  And the reason we ask about it is my concern is and I think all of us, all of our concerns is that we are on a level playing field to begin this trial.  Obviously, there's going to be facts and evidence.  And the reason the question's asked and the question I had for you is do you think that the fact that you have that opinion could in some way affect your ability to be fair and impartial in this case in the sense that you're thinking, you know, so many times African-American males are targeted and aren't treated fairly in the system, I need to do my best to sort of compensate for that.

[Mr. Gorham]:    No, I answered the the [*sic*] question the way the question was asked.  To say I'm going to be partial to somebody, I don't think so.

[Prosecutor]:    So you can assure me you would judge this case by the facts as they're presented in the case and the law as you discussed in your prior jury service and apply the law even though you may not completely agree with the letter of the law?

[Mr. Gorham]:    Yes.

(LD4 at 1115-16.)  During peremptory challenges, the prosecutor excused Mr. Gorham.  (<u>Id.</u> at 1377.)

12

e.  <u>Charles Richardson</u>

In response to certain questions posed by the trial court during voir dire, Mr. Richardson relayed a story in which he had a negative experience with law enforcement: "I was pulled over with a group of friends by gun point for traveling on the freeway by Arden Way and I guess they mistaken [*sic*] us for a vehicle that was stolen."  (LD4 at 1394.)  Mr. Richardson also stated that his brother was accused of drug possession and rape, and that the case was pending in the Sacramento County Superior Court.  (<u>Id.</u> at 1411.)

The prosecutor then questioned Mr. Richardson about his response to Question 40 on the juror questionnaire, in which Mr. Richardson wrote that he did not feel that African Americans are treated fairly by law enforcement.  (LD4 at 1414.)

[Prosecutor]:   Does that relate to your brother at all or just other things you observed?

[Mr. Richardson]:   Just other things.  I've been pulled over with my father.  And, you know, once they get up to me they say you know the law enforcement officer said that the car fit the description of being stolen.  And he asked me whose car it was.  It's my father's.  My father's sitting next to me.  So, just things like that.  I mean, we're all human.  I don't judge people.  I just, you know –

[Prosecutor]:   That's something you've experienced anyway?

[Mr. Richardson]:   Correct.

[Prosecutor]:   And I think you were the one that was also talking about the situation where you were pulled over at gun point?

[Mr. Richardson]:   Correct.

[Prosecutor]:   You were in another – a car with other –

[Mr. Richardson]:   Four individuals.  My friend was driving the car and it was probably about three or us in the back seat someone in the passenger seat.  They pulled us over had megaphone, told us all to get out of the car.  We put our hands up; things like that.

I didn't know what was going on.  And then all they say everything is okay.  You know.  But they had the guns out.  Somebody would have did something stupid, you know, they may have shot the gun or something.

/////

13

1   (LD4 at 1414-15.)  When asked whether he would allow these experiences to affect his judgment

2   in that case, Mr. Richardson stated that the prosecution would not be starting at a disadvantage.

3   (Id. at 1416.)  During peremptory challenges, the prosecutor excused Mr. Richardson.  (Id. at

4   1458.)

5                               ii.  The Batson Motions

6          Petitioner raised a Batson motion following the prosecutor's dismissal of Mr.

7   Cusic and Ms. Harris.  (LD at 1242-43.)  At that point, the trial court did not find that a prima

8   facie case had been made.  (Id.)  Petitioner subsequently renewed his motion following Ms.

9   Terrell's dismissal and argued  that of the five African Americans who have made it past

10  challenges for cause, three had been peremptorily challenged; Ms. Terrell clearly indicated she

11  could be impartial despite her past experiences; and Ms. Terrell stated on her questionnaire that

12  African Americans are treated fairly by law enforcement and by the judiciary.  (Id. at 1308-09.)

13  At the renewal of the motion, the trial court found that the defense did make a prima facie

14  showing as to Ms. Terrell and requested a race-neutral explanation from the prosecutor.  (Id. at

15  1313.)

16          In response, the prosecutor expressed two concerns with Ms. Terrell.  (See LD4 at

17  1243-44.)  The first was Ms. Terrell's experiences "at the state fair where she thought that male

18  African Americans were inappropriately contacted by law enforcement."  (Id. at 1243.)  Ms.

19  Terrell's follow-up answers to the prosecutor's questions, though, were more of a concern for the

20  prosecutor than the fact of her experience.  (See id. at 1243.)  The prosecutor explained, "I asked

21  her a number of different times whether anything about that would affect her in this case, and she

22  was very – she hedged; and she basically said, I don't know, things come up.  My current plan is

23  not that I would allow that to affect me, but things do come up.  And I don't know what kind of

24  case this is, et cetera."  (Id.; see also LD4 at 1314-15.)

25          The prosecutor's biggest concern as to Ms. Terrell, however, was the issue of her

26  "juror remorse":

                                        14

. . . I can honestly say, I've never seen a situation like this in my doing jury selection where a juror, basically, has come away from a prior jury service with basically juror remorse, thinking that was there [*sic*] something she didn't hold out. In a situation – it sounded to me, although I wasn't allowed to do a full voir dire in this area, that she was – that she didn't think she had carefully enough looked at a particular piece of evidence. I think it was witness testimony. And she started – where our questioning – line of questioning was stopped, she started discussing the fact that she thought there were members of the jury that were – I think that sort of imposed their will on her. And, you know, in a situation – and I did not seek – move to strike her based on cause.

But as far as a peremptory goes and given the fact that I need unanimity here, I have a concern and do not want that prior experience where she, at least, has left with some feeling that perhaps she should have stood up for herself more, was overwhelmed by someone else in the jury room, didn't give careful enough deliberation to what a witness said, accepted what a witness said at face value. That caused me a lot of concern. It's well within my rights, in terms of exercising a peremptory challenge, to challenge someone on that basis. Obviously, that separates her from all others. And I think I did have extensive voir dire with her on that issue, both issues actually.

(LD4 at 1243-44, 1314-15.)

The prosecutor had also previously explained his dismissal of Mr. Cusic and Ms. Terrell following the defense's first two <u>Batson</u> motions, even though at that time the trial court did not find a prima facie case. (<u>See</u> LD4 at 1242-43.) As to Mr. Cusic, the prosecutor excused him because he was sleeping during voir dire and had recently been arrested by West Sacramento police officers. (<u>Id.</u> at 1242.) As to Ms. Harris, the prosecutor said he excused her because "she reported significant profiling personal experiences of what she considered to be discrimination, and specifically in the area of the West Sacramento Police Department officers . . . ." (<u>Id.</u>)

After hearing the prosecutor's reasons for excusing Ms. Terrell, the trial court held that "there [was] an adequate justification for the peremptory challenge that [the prosecutor] exercised with respect to Ms. Terrell. I find that the People have given a race neutral explanation for the exercise of that peremptory challenge and that it is adequate – that the justification is adequate. . . . So the motion at this point is denied." (LD4 at 1315-16.)

/////

15

Next, following the prosecutor's peremptory challenge of Mr. Gorham, petitioner raised a third <u>Batson</u> motion.  (LD4 at 1377, 1417.)  There, he argued that by removing Mr. Gorham, the prosecutor had excused four out of the six African-Americans who had reached the jury box; that Mr. Gorham stated he would be a fair and impartial juror; and that Mr. Gorham's negative experience with law enforcement was limited to one police officer.  (LD4 at 1418-19.) The trial court found that a prima facie case had been made and asked the prosecutor for a race-neutral explanation, which is reproduced here:

> Yes, your Honor.  Mr. Gorham identified a number of, I think, rather significant negative contacts he'd had with law enforcement.  He talked about the fact that his car had been broken into and he felt there was inadequate response to that.  That he had been subject to racial profiling.  He identified having been pulled over and on at least one occasion when he thought that was inappropriate.

> He also identified this protracted struggle he had with an officer in which an officer continued to ticket his van and that he thought – felt that was based on race.

> But if those were the only – only things he said I wouldn't have the concern I do over just his general statement regarding the treatment of African-Americans.  And basically what he says, and I think I'm fairly close quoting, he sees what goes on in the neighborhood and everyone considers African-Americans scapegoats.

> And that African-Americans are unduly scrutinized.  They are made scapegoats by our society.  That was what really concerned me, because, you know, we're dealing with a situation here where now he's going to be part of a procedure to determine the guilt or innocence of these particular defendants and he has a view of the treatment of African-Americans both in law enforcement and the judicial system because on the questionnaire when he was asked the question about African-American males he answers "P" private, which leads to the subsequent discussion and he described the situation with African-Americans through his perception as African-Americans being scapegoats[. T]hat's a very strong statement, stronger than any – obviously stronger than any other juror who has come before the Court has made regarding his perception of the way African-Americans are treated by the system.

> And I did not and I expressed those concerns at the time when we were in chambers talking about Miss Terrell.  My concern was at the time was that there is an issue as to racial composition as important and I recognize that.  And had it not been for the fact that Mr. Gorham was African-American I would have struck him immediately based on those statements because of my concerns about his ability to be fair and impartial and because preemptory [*sic*] strikes are just concerns that I have that don't rise to the level of cause.

> The fact he beliefs [*sic*] that the race of which the defendants are a member, are categorically scapegoats, the fact he's had a number of negative experiences himself raise great concern in my opinion as to whether he would be a good juror for the People.

(LD4 at 1436-37.)  Based on these reasons, the trial court found that the prosecutor gave "bona fide reasons, [ ] race neutral reasons for the exercise of this peremptory challenge."  (LD4 at 1438.)

Finally, following the prosecutor's challenge of Mr. Richardson, petitioner raised a fourth Batson motion. (LD4 at 1458.)  Petitioner argued that Mr. Richardson was the seventh African-American to reach the jury box and the fifth to be excused by the prosecutor (a 71% dismissal rate); he was gainfully employed; was a student at Sacramento City College; served in the Marine Corps; and had some sort of negative experience with law enforcement.  (LD4 at 1460.)  Upon finding that a prima facie case has been made, the court asked the prosecutor to explain the peremptory challenge of Mr. Richardson.  The prosecutor's explanation is as follows:

> Well, just as the Court noted, his brother's four years older than him that is currently pending a case, a serious case, that is being prosecuted by my office. Actually the unit that I'm currently in the rape case.  He said right now he doesn't have information because he hasn't talked to his dad and gotten the information, but certainly I cannot – first of all, just on its face that fact alone separates him from anyone else who has come before the panel that he has a brother who is being prosecuted by my office.

> Add to that, the fact it's a currently pending case for which there may be developments that he may learn about that may increase add – and add to the bias that is already sort of implied by that situation.

> I mean, that's not – if he – one thing, if he were pending some sort of misdemeanor case he's pending a rape his brother is in custody in the same county jail where the defendants are being housed.

> That is just too much of a wild card and it really concerns me that our office is prosecuting his brother at the same time he's been sitting in a jury where we would be sitting on a jury where we would be prosecuting others.

> So, that was a significant factor.  Also, the fact that he was pulled over at gun point.  It obviously was a significant experience for him the way he described it.  The fact he thought that law enforcement was over the top because they actually pulled out their guns, the fact it was connected to the idea in his mind that there was essentially profiling going on, mistaken identity, he went on to describe another circumstances [*sic*] in terms of the profiling that he had been a

part of or he was pulled over for vehicle theft that he – he thought it was unreasonable on the part of law enforcement because of the fact that his dad was sitting right there and the car was registered to his dad.

Also he's had negative experiences with law enforcement in that he's identified the fact that he didn't think they followed up well enough when a crime was committed where he was the victim.

So, he has significant negative experiences with law enforcement; he has a brother who is currently pending prosecution by my office, and I think that clearly would be – any of those would be substantial reasons for me not to want to have him sit on this jury.

(LD4 at 1467-68.)  The trial court found that the prosecutor gave a bona fide, race-neutral explanation that was supported by the record for dismissing Mr. Richardson.  (LD4 at 1469.)

### 2.  State Court Decision

The last reasoned decision with respect to this claim is the opinion of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The Court of Appeal explained the facts surrounding this claim and its legal analysis as follows:

Defendants contend the trial court should have granted their *Batson-Wheeler* motions due to the prosecutor's alleged race-based exercise of peremptory juror challenges and disparate questioning of jurors.  (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258.)  Defendants made four unsuccessful *Batson-Wheeler* motions in the trial court, and on appeal challenge the rulings on each motion.  They separately couch their claim as a denial *to the individual jurors* of equal protection.  We conclude the trial court ruled properly on defendants' motions.  Even if defendants could raise the issue of each juror's right to be evaluated without racial bias, no denial of such right has been shown.

At the time of trial *Batson-Wheeler* motions were analyzed by California courts as follows:

"A party's use of peremptory challenges is presumed to be valid.  The presumption is rebutted if the other party establishes a prima facie case that jurors were challenged solely on the basis of their presumed group bias. [Citation.]  To establish a prima facie case, a party 'should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a *strong likelihood* that such persons are being challenged because of their group association rather than become of any specific bias.' [Citations.] . . . [¶] . . .

18

"Once a prima facie case has been shown, the burden shifts to the other party to provide race-neutral explanations for each of the disputed peremptory challenges. [Citations.] If the court finds, as to any of the challenges, that the burden of justification is not sustained, the presumption of validity is rebutted." (*People v. Williams* (1997) 16 Cal.4th 153, 187 (*Williams*).)

After the trial in this matter the United States Supreme court decided two cases clarifying the applicable standards. (*Miller-El v. Dretke* (2005) 545 U.S. ___ [162 L.Ed.2d 196] (*Miller-El II*); *Johnson v. California* (2005) 545 U.S. ___ [162 L.Ed.2d 129] (*Johnson*).) *Johnson* made it easier to make a prima facie showing, rejecting the 'strong likelihood' language previously used by the California Supreme Court in several cases, including the above quotation.  For purposes of this appeal, we assume defendants established a prima facie case as to each challenged juror.  (See *People v. Ward* (2005) 36 Cal.4th 186, 201, fn. 2 (*Ward*).)  For this reason we do not separately address claims that the trial court misapplied the rules regarding the prima facie cases.

The issue remaining on appeal as to each challenged juror is whether the trial court properly found the prosecutor's actual reasons for the challenges were not racially based.  We also address the defense claim that the prosecutor's manner of questioning jurors reflects racial bias.

In upholding a prosecutor's stated reasons for exercising a challenge, a court need not *agree* with the reasons, the court must instead find that they are genuine, reasonably specific and free of unlawful bias.  They can be reasons which – particularly on a cold appellate record – may appear trivial, including a prospective juror's body language, attitude, lack of attention and so forth. (*People v. Arias* (1996) 13 Cal.4th 92, 136; *Wheeler*, supra, 22 Cal.3d at p. 275; *People v. Allen* (2004) 115 Cal.App.4th 542, 547; *People v. Walker* (1998) 64 Cal.App.4th 1062, 1067 [conduct which may support a challenge is "often subtle, visual, and therefore incapable fo being transcribed, subjective, and even trivial"] (*Walker*).)

The ultimate issue is the persuasiveness of the reason in light of the record, that is, whether the record supports the finding that the challenge was properly exercised.  (See *Miller-El v. Cockrell* (2003) 537 U.S. 322, 338-339 [154 L.Ed.2d 931, 951] (*Miller-El I*); *People v. Reynoso* (2003) 31 Cal.4th 903, 907-908 (*Reynoso*).)  Formal findings are not needed:

"Where . . . the trial court is fully apprised of the nature of the defense challenge to the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible [citation], and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that

the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (*Reynoso*, *supra*, 31 Cal.4th at p. 929.)

The *trial court* determines whether the stated reason is genuine and free from disciplinary intent, upon a sincere and reasoned attempt to evaluate the prosecutor's explanation. (*People v. Hall* (1983) 35 Cal.3d 161, 167-168.) We must give great deference to the trial court's decision. (*People v. Ervin* (2000) 22 Cal.4th 48, 74-75 [" 'great restraint' "]; *Reynoso*, *supra*, 31 Cal.4th at pp. 918-919.) But deference is not abdication: "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*People v. Silva* (2001) 25 Cal.4th 345, 386; see *Williams*, *supra*, 16 Cal.4th at pp. 189-190.)

## A.  Group Bias

### 1.  Shared Beliefs

Defendants repeatedly assert that because so many African-Americans are subjected to negative law enforcement contacts, such as racially-motivated traffic stops, that African-Americans as a group have a negative view about law enforcement or believe the legal system is unfair. Indeed, they emphasize that in this case "[e]very *African American [prospective juror] had some type of negative experience with law enforcement.*" Therefore, continue defendants, although normally a prosecutor may properly challenge a juror who distrusts the system or law enforcement, such a challenge reflects improper group bias if lodged against an African-American. We agree with the Attorney General that defendants offer no authority for this proposition, only authority for the generic proposition that a prosecutor may not exercise a challenge based on the presumed beliefs of a group.

The defense claims are largely refuted by a careful reading of *Wheeler*. After describing some facts which may support a peremptory challenge, the court continued:

"All of these reasons, nevertheless, share a common element: they seek to eliminate a specific bias as we have defined that term herein – a bias relating to the particular case on trial or the parties or witnesses thereto. By the same token, they are essentially neutral with respect to the various groups represented on the venire: the characteristics on which they focus cut across many segments of our society. Thus both blacks and whites may have prior arrests, both rich and poor may have been crime victims, both young and old may have relatives on the police force, both men and women may believe strongly in law and order, and members of any group whatever may alienate a party by 'bare looks and gestures.' It follows that peremptory challenges predicated on such reasons do not significantly skew the

population mix of the venire in one direction or another; rather, they promote the impartiality of the jury without destroying its representativeness.

"By contrast, when a party presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds – we may call this 'group bias' – and peremptorily strikes all such persons for that reason alone, he not only upsets the demographic balance of the venire but frustrated the primary purpose of the representative cross-section requirement.  That purpose, as we have seen, is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences.  Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority.  Seen in this light, the presumed group bias that triggered the peremptory challenges against its members is indistinguishable from the group perspective we seek to encourage by the cross-section rule." (*Wheeler*, *supra*, 22 Cal.3d at p. 276.)

The fact that a juror believes law enforcement or the legal system is unjust because of endemic racism "is a view not based on the race of the prospective juror and it is not linked to any racial group. . . . This Court, in fact, has held that '[c]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*.'" (*United States v. Steele* (9th Cir. 2002) 298 F.3d 906, 914; see *People v. Mayfield* (1997) 14 Cal.4th 668, 724 [juror lacked "confidence in the ability of the judicial system to 'convict the right people' "].)  Because such a belief may be held by persons of any race, a challenge based thereon does not of itself reflect that the prosecutor is assuming anything about the juror *because of the juror's race*.  And, as we will show, each challenge in this case went beyond the alleged generally – shared experiences of all African Americans.

### 2.  Comparative Analysis

The claim of group bias is elaborated by focussing [*sic*] on two written questions, questions 40 and 41, as follows:

"40.  In general, do you feel that African Americans are treated fairly or unfairly by law enforcement in Sacramento? [¶] FAIRLY _____     UNFAIRLY _____ [¶] Please explain your answer[.]"

"41.  Do you feel that African American males:
         A.  Are unjustly accused of committing more crimes than other persons? [Yes/No]
         B.  Are more likely to commit crimes than other persons? [Yes/No]
/////

21

C.  Are treated as fairly by law enforcement as other persons? [Yes/No]

D.  Are treated [as] fairly by the judicial system as other persons? [Yes/No]

If yes to A or B, or no to C or D, please explain[.]"

Defendants characterize the "correct" responses, that is, the ones sought by the prosecutor, to be "fairly" to question 40 and "No-No-Yes-Yes" to question 41.  They assert that the prosecutor questioned prospective jurors who gave "incorrect" answers differently, depending on race: According to defendants, all but two African-American prospective jurors were asked to explain their answers but only three non[-]African-American prospective jurors were asked to do so.  They concede that *nine* of the 15 sworn jurors or alternates had given "incorrect" answers, and two of these were African-American.  Defendants rely on opinions to the effect that in an appropriate case, *disparate questioning* can lead to an inference of bias.  (*Miller-El I*, *supra*, 537 U.S. at pp. 331-333 [154 L.Ed.2d 931, 946-948] [prosecutor's manner of questioning sharply differed according to the race of prospective jurors]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1265, 1268-1269 (dis. opn. of Mosk, J.) [opining the questions showed prosecutor believed Jews could not be fair in a case of a minority defendant, because of their history of oppression, and believed another juror "would be biased in favor of Black defendant merely because she was herself Black"].)

Defendants did not make this specific claim in the trial court, thereby depriving the People of any opportunity to include facts in the appellate record to refute it.

*Miller-El II* held in part that *comparative juror analysis* may be a useful tool in determining whether a prosecutor's facially neutral reason masks invidious discrimination, because the trial court must "assess the plausibility of that reason in light of all evidence with a bearing on it," which might in a given case include comparative juror analysis.  (*Miller-El II*, *supra*, 545 U.S. ___ [162 L.Ed.2d at p. 221].)  For purposes of this case we accept that a *comparative juror analysis* can be made for the first time on appeal, an issue several California Supreme Court cases have declined to resolve since *Miller-El II* was decided.  (See *People v. Schmeck* (2005) 37 Cal.4th 240, 270; *People v. Gray* (2005) 37 Cal.4th 168, 188-189; *People v. Cornwell* (2005) 37 Cal.4th 50, 71; *Ward*, *supra*, 36 Cal.4th at p. 203.)  But those cases involved comparing jurors for similarities based on their voir dire answers, not attacking the prosecutor's manner of questioning the jurors.  The former provides a record of the facts about each juror which arguably may be reviewed by the appellate court for the first time; here, for lack of a proper objection in the trial court we have no record of the prosecutor's decisions about which jurors to ask which questions.  In such circumstances, we will not address the objection for the first time on appeal.

Defendants claim they did invoke a *comparative juror analysis* in the trial court but this is not accurate; they merely pointed out to the trial court the racial percentages of jurors challenged at different points during the process.  Nor did they raise a *disparate questioning claim*, which has been characterized as separate from *comparative juror analysis.*  (See *Miller-El I*, *supra* 537 U.S. at pp. 331-332 [154 L.Ed.2d at pp. 946-947 [distinguishing Miller El's evidence based on

"comparative analysis of the venire members" from evidence of "the manner in which members of the venire were questioned" depending on their race].)  As a general rule, raising one claim does not preserve another.  (See, e.g., *People v. Morris* (1991) 53 Cal.3d 152, 190; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeals, § 394, p. 444.)  Defendants rely on a contextual snippet of an opinion to the effect that when a comparative analysis is presented "to the trial court, the reviewing court must consider that evidence, along with everything else of relevance," in reviewing the issue.  (*People v. Johnson* (2003) 30 Cal.4th 1302, 1324-1325.)  Plainly that does not mean a reviewing court must consider "everything else" under the sun, but only "everything else" *that was before the trial court* or at least, "everything else" for which an adequate record is supplied.

Moreover, as the Attorney General points out in detail, non-African American jurors were questioned along similar lines, either by the prosecutor or by defense counsel.  In their reply defendants ignore this detailed recitation, supported by record references, and baldly assert that "the record discloses no similar questioning of Caucasians as to that which was directed to African Americans."  In the opening brief they focussed [*sic*] on purported differences between African American and "non-African American" jurors.  Without explanation – except possibly because the Attorney General read the record thoroughly and made a persuasive argument – defendants shift to a discussion of purported differences between African Americans and "Caucasians."  They also set out a host of questions they believe the prosecutor should have, but did not, ask a number of jurors.  We find the Attorney General's synopsis to be substantially accurate, indicating that some non-African Americans were questioned in the manner condemned by defendants, and at least one African American juror (Juror No. 4), who had answered the questionnaire "incorrectly" in the defense terminology, *was not questioned*, a fact conceded by defendants and which substantially undermines their claim.

Thus there is no bright line separating the questioning of African Americans and others such that we could adequately address the issue absent an objection.  Nor are the questions identified by defendants *facially* improper; they simply show the prosecutor asked a number of African Americans if he (the prosecutor) would be at a disadvantage because the defendants were African American, where the prospective jurors had answered that African Americans were treated unfairly by the police or by the legal system.  Such questions were thus triggered not by race, but by the juror's questionnaire answers or voir dire testimony.  If the defense thought these questions were unfair of themselves or unfairly motivated, it was incumbent on the defense to make a record in the trial court by lodging an appropriate objection or motion.

## B.  The Individual Challenges

Before addressing the individual challenges, we reject the assertion, repeatedly made by defendants, that when a juror states he or she can be fair, or can ignore some past incident described on a questionnaire, such testimony must be accepted by the prosecutor.  This is not correct insofar as peremptory challenges are concerned.  A prosecutor does not have to believe a juror's voir dire testimony and, as stated above, may base a peremptory challenge on a subjective feeling about the juror, so long as the reason is not a sham, designed to

23

conceal invidious discrimination.  (See *Walker*, *supra*, 64 Cal. App.4th at p. 1067.)  For example, one juror said he could *not* promise to be fair, based on his own experience with what he believed was a race-based traffic stop, and his belief that Sacramento police officers "automatically assume the worst" about African Americans.  Although he later said he *could* be fair, the prosecutor could rationally continue to harbor doubts about the juror.  Similar cases occurred as to other jurors, and defendants assume the prosecutor was bound to accept the rosiest version.  Not so.  We will now evaluate the contested challenges, in the order discussed by defendants.

### 1.  David C.

David C. was an African-American pastor who stated he had favorable views of Sacramento law enforcement, despite a negative incident with the police.  The prosecutor challenged David C. because he was inattentive and had slept during part of the voir dire and because of the negative police contact.  The trial court found David C. had indeed been dozing and found the explanation "given by the People as to why they exercised their peremptory challenge with respect to Mr. [C.] is supported by the record, and I find that it is a race neutral explanation."  The trial court denied the *Batson* motion.  Defendants "concede[ ] the prosecutor stated race neutral reasons" because of the inattention, but without persuasive argument assert the challenge "should be taken into account when considering appellant's argument in the cumulative" and the trial court must actually find such race-neutral reasons motivated the challenge.  As for the former, if the challenge was lawful, it adds nothing to their argument.  As for the latter, although the trial court did not state the reason was *genuine*, she impliedly so found by the language she used and by denying the motion.

### 2.  Angela H.

Angela H. was an African-American who had had negative law enforcement contacts.  The prosecutor challenged Angela H. because she believed African-Americans are treated unfairly by the system and believed she had been the victim of racial profiling by the West Sacramento police.  The trial court found this was a sincere reason, despite the fact that Angela H. testified she could "block that out," finding "given that the People are going to have several West Sacramento police officers [as witnesses], I think they have offered a race neutral explanation as to why she would not be a good juror to sit in judgment in this case, given that.  And I find that that is also supported by the record."

Defendants again assert that because *all* African Americans experience racial profiling, challenging any African American for such a background amounts to group bias.  Even if we accepted that argument, here the bias was more specific: The prosecutor believed Angela H. had bias against *West Sacramento* officers, in a case where several officers from that department would be testifying.  That is a race-neutral reason.

### 3.  Linda T.

Linda T. had answered that African Americans are treated "Sometime[s] unfairly going to different events," based on "what I've seen."  She testified she

had seen African American youths mistreated t the State Fair but did not "plan" to have that incident affect her in this case.  In response to a written question asking her to state what impressions she had formed of prior juror service, she answered "To really think harder."  She testified she had been on a jury before and apparently had accepted some evidence or a jurors' comment at face value, but later apparently had some concerns.  The details are sketchy because the trial court cut off the questioning, to preserve the integrity of the jury deliberations in the prior case.

Defendants accuse the prosecutor of "grossly" mistreating what Linda T. said about her prior jury service, because later in the record he recalled in part that she may have been "strong-arm[ed]."  The prosecutor did make such a statement, but there is no showing this was a pretext, rather than an innocent mistake based on a sketchy record, or the prosecutor's hunch bout what drove Linda T. to give the odd responses about her prior jury service that she made.  He challenged Linda T. because she expressed "remorse" over her prior jury service.  "In addition, she had issues with the way she had seen African American males treated and couldn't make the assurance that that was a totally separate incident, therefore, would not factor into the way she viewed this case."  The trial court sustained the challenge and denied the defense motion.

As indicated, Linda T. said she did not "plan" to allow the prior state fair incident to become an issue as she evaluated the evidence in this case, but the phrasing she used apparently raised a doubt in the prosecutor's mind, not enough for a challenge for cause, but sufficient for a peremptory challenge.  Thus, this reason was not solely based on the alleged common racial experience of African Americans, as alleged by defendants.  Further, although the prosecutor was not allowed to inquire too deeply into Linda T.'s prior jury service, her responses were enough to raise a doubt in the prosecutor's mind.  The trial court, who was in a position to review the juror's body language and manner of answering questions, sustained the challenge; we, who have only a cold transcript to review, see no basis to upset her finding.  (See *People v. Boyette* (2002) 29 Cal. 4th 381, 422 ["The trial court was clearly aware of the answers these jurors had provided on the questionnaires and observed their demeanor as they testified, two factors undermining defendant's claim that the court accepted the prosecutor's reasons without reviewing the record"]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1197-1198.)

We reject the defense assertions that the reasons were implausible and the trial court did not find that they were sincere.  She impliedly so found.

### 4.  Louis G.

Louis G. wrote that he had had an experience of "racial profiling in Merced, CA.  Stopped and harassed."  An officer in Merced had repeatedly ticketed him unfairly.  "[B]lack persons are targeted for some reason or other" and are "the scapegoat for a lot of things."  He felt the police had not responded well when his car had been stolen or broken into.

The prosecutor referred to "a number of . . . rather significant negative contacts he'd had with law enforcement," and mentioned the inadequate response

to the car incident, that Louis G. felt he had been subjected to racial profiling and "He also identified this protracted struggle he had with an officer in which an officer continued to ticket his van and that he . . . felt that was based on race." More important, in the prosecutor's view, was Louis G.'s "general statement regarding the treatment of African-Americans," that they are viewed as scapegoats and "unduly scrutinized," making a "strong statement . . . obviously stronger than any other juror who has come before the Court has made regarding his perceptions of the way African-Americans are treated by the system." The trial court found these were bona fide and race-neutral reasons, supported by the record. These reasons show more than the alleged group experience of negative police contacts that defendants proffer, or the alleged view of African Americans that they are used as scapegoats." (See *People v. Turner* (1994) 8 Cal.4th 137, 170-171 [negative experience with law enforcement supports challenge]; cf. *Wheeler, supra*, 22 Cal.3d at pp. 275-276.)

In attempting to refute the claim that a prima facie had been shown, the prosecutor said he had been concerned about Louis G. earlier – and had expressed that concern in a chambers conference regarding Linda T. – but had not struck him immediately because of concerns about composition of the jury:

> "And had it not been for the fact that [Louis G.] was African-American I would have struck him immediately based on those statements because of my concerns about his ability to be fair and impartial and because [peremptory] strikes are just concerns that I have that don't rise to the level of cause. [¶] The fact that he [believes] that the race of which the defendants are a member, are categorically scapegoats, the fact he's had a number of negative experiences himself raise great concern in my opinion as to whether he would be a good juror for the People."

The record shows that when he was describing his reasons for striking Linda T., *viz.*, negative police contacts, the prosecutor added: "And rather than saying the same thing that [Juror G.] and others have said – that's an independent situation – she said that I don't know what the facts of this are. You know, she equivocated more." Contrary to a defense assertion on appeal, the fact the prosecutor first passed on this juror does not mean the reasons give for the later challenge were a pretext. Defendants assert that the above passages show Louis G. was used as an excuse to challenge Linda T., but when another African American appeared on the jury, the prosecutor struck Louis G. *to minimize their numbers*. The record, viewed with deference to the trial court's ruling, does not support that contention.

### 5. Charles R.

Charles R. answered the questionnaire in part by stating African Americans are treated unfairly, and are judged by "our skin color." During voir dire he testified that Sacramento law enforcement failed to adequately pursue leads when his "car was broken into, vandalized." He also had experiences with racially-based traffic stops, and once was pulled over at gunpoint. He told the court he could put those experiences aside.

Charles R.'s older brother was pending prosecution for rape and drug possession by the Sacramento District Attorney's Office, a fact defendants concede provides a race-neutral ground for the challenge. Nonetheless, they contend the challenge should be "taken into account" because he testified he was not close with his brother and did not feel the prosecution was unfair. However, the prosecutor did not have to believe R.'s voir dire testimony that he was not close to his brother and did not have to accept a juror who might harbor animus against the prosecutor out of family loyalty. (*Wheeler*, *supra*, 22 Cal.3d at p. 277, fn. 18 [juror's stepson incarcerated, "A personal experience of this nature, suffered either by the juror or a close relative, has often been deemed to give rise to a significant potential for bias against the prosecution"].) The prosecutor felt "that is just too much of a wild card and it really concerns me that our office is prosecuting his brother;" the prosecutor also mentioned an incident when the juror was pulled over at gun point and other "negative" law enforcement contacts. The trial court accepted these race-neutral reasons, noting in particular that R.'s brother was housed at the mail jail, where both Scott and McPherson were housed during trial. It is true, as defendants point out, that the trial court did not explicitly state that it found they were the *genuine* reasons, but such is readily inferred from the tenor of the passage and the denial of the motion, as we have concluded as to other challenges.

3. Standard of Review

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. See Batson, 476 U.S. at 96 ; Johnson v. California, 545 U.S. 162 (2005). So-called Batson claims are evaluated pursuant to a three-step test:

First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations]. Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations .] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]

Johnson, 545 U.S. at 168 (footnote omitted); Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).

In the instant action, the California Court of Appeal employed the correct legal standard by using the "inference" test rather than the "strong likelihood test" in determining whether petitioner had established a prima facie case. Accordingly, this court is required to use a deferential standard when reviewing a habeas petition's claims that were previously adjudicated

by a state court on the merits.  28 U.S.C. § 2254(d).  Under those circumstances, a district court

only grants a habeas petition where the decision of the state court was contrary to, or an

unreasonable application of, clearly established Supreme Court precedent.  28 U.S.C.

§ 2254(d)(1).

4. <u>Analysis</u>

This court will evaluate petitioner's <u>Batson</u> claims with reference to the standards

set forth above.

First, the defendant must make out a prima facie case "by showing that the totality

of the relevant facts gives rise to an inference of discriminatory purpose."  <u>Johnson v. California</u>,

545 U.S. 162, 168 (2005) (footnote omitted).  In order to establish a prima facie case of racial

discrimination, petitioners must show that "(1) the prospective juror is a member of a

'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror, and

(3) the totality of the circumstances raises an inference that the strike was motived by race."

<u>Boyd v. Newland</u>, 467 F.3d 1139, 1143 (2006) (citing <u>Batson</u>, 476 U.S. at 96 and <u>Cooperwood</u>

<u>v. Cambra</u>, 245 F.3d 1042, 1045-46 (9th Cir. 2001)).  A prima facie case of discrimination "can

be made out by offering a wide variety of evidence, so long as the sum of the proffered facts

gives 'rise to an inference of discriminatory purpose.'"  <u>Johnson</u>, 545 U.S. at 169 (quoting

<u>Batson</u>, 476 U.S. at 94.)[2]  In evaluating whether a defendant has established a prima facie case, a

reviewing court should consider the "'totality of the relevant facts' and 'all relevant

circumstances' surrounding the peremptory strike."  <u>Boyd</u>, 467 F.3d 1146 (quoting <u>Batson</u>, 476

U.S. at 94, 96).  This should include a review of the entire transcript of jury voir dire in order to

conduct a comparative analysis of the jurors who were stricken and the jurors who were allowed

_____

[2] In <u>Batson</u>, defense counsel timely objected to the prosecutor's use of peremptory challenges because they resulted in striking "all black persons on the venire."  <u>Id.</u>, 476 U.S. at 100.  The Supreme Court held that this was a sufficient basis to find an inference of racial discrimination and that the trial court erred when it "flatly rejected the objection without requiring the prosecutor to give an explanation for his action."  <u>Id.</u>

1   to remain.  Boyd, 467 F.3d 1144, 1149 ("We believe, however, that Supreme Court precedent

2   requires a comparative juror analysis even when the trial court has concluded that the defendant

3   failed to make a prima facie case").  See also Miller-El v. Dretke, 545 U.S. 231 (2005) (using

4   comparative analysis, in a case in which a prima facie showing had been made, to determine

5   whether the prosecutor had been motivated by racial bias in exercising peremptory challenges).[3]

6          At the second step of the Batson analysis, "the issue is the facial validity of the

7   prosecutor's explanation."  Hernandez v. New York, 500 U.S. 352, 360 (1991).  For the second

8   step of the Batson inquiry focusing on the prosecutor's explanation, "a neutral explanation in the

9   context of our analysis here means an explanation based on something other than the race of the

10  juror."  Id.  "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason

11  offered will be deemed race-neutral."  Stubbs v. Gomez, 189 F.3d 1099, 1105 (9th Cir. 1999)

12  (quoting Hernandez, 500 U.S. at 360).  For purposes of step two, the prosecutor's explanation

13  need not be "persuasive, or even plausible."  Purkett v. Elem, 514 U.S. at 765, 768 (1995).

14  Indeed, "to accept a prosecutor's stated nonracial reasons, the court need not agree with them."

15  Kesser v. Cambra, 465 F.3d at 351, 359 (9th Cir. 2006).  "It is not until the third step that the

16  persuasiveness of the justification becomes relevant--the step in which the trial court determines

17  whether the opponent of the strike has carried his burden of proving purposeful discrimination."

18  Purkett, 514 U.S. at 768.

19         It is at the third step of the three-step inquiry that the court reaches the "real

20  meat" of a Batson challenge.  Lewis, 321 F.3d at 830.  It is at this step that "the trial court must

21  _____

22         [3]  Comparative juror analysis refers to "an examination of a prosecutor's questions to
    prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise

23  similar jurors differently because of their membership in a particular group."  Boyd, 467 F.3d at
    1145.  See also Kesser v. Cambra, 465 F.3d 351, 360-362 (9th Cir. 2006) (en banc) (the "totality

24  of the relevant facts" includes "the characteristics of people [the prosecutor] did not challenge.").
    "If a prosecutor's proffered reason for striking a black panelist applies just as well to an

25  otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove
    purposeful discrimination . . . ."  Miller-El, 545 U.S. at 241 ("side-by-side comparisons of some

26  black venire panelists who were struck and white panelists allowed to serve" was "more
    powerful" than bare statistics).

1  determine whether the defendant has carried his burden of proving purposeful discrimination."

2  McClain, 217 F.3d at 1220 (quoting Hernandez, 500 U.S. at 359).  See also Batson, 476 U.S. at

3  98.  Thus, the trial court must evaluate the prosecutor's proffered reasons and make a credibility

4  determination.  Lewis, 321 F.3d at 830; McClain, 217 F.3d at 1220.  As with any credibility

5  determination, the trial court's own observations are of significant importance.  Batson, 476 U.S.

6  at 98, n.21; Lewis, 321 F.3d at 830.  It has also been observed that:

7      Other factors come into play in a court's evaluation of a prosecutor's reasons as
       well, however. For example, if a review of the record undermines the prosecutor's
8      stated reasons, or many of the proffered reasons, the reasons may be deemed a
       pretext for racial discrimination. Similarly, a comparative analysis of the struck
9      juror with empaneled jurors "is a well-established tool for exploring the
       possibility that facially race-neutral reasons are a pretext for discrimination."
10     [citation omitted.]  After analyzing each of the prosecutor's proffered reasons, our
       precedent suggests that the court should then step back and evaluate all of the
11     reasons together. The proffer of various faulty reasons and only one or two
       otherwise adequate reasons, may undermine the prosecutor's credibility to such an
12     extent that a court should sustain a *Batson* challenge.  [citation omitted.]

13  Lewis, 321 F.3d at 830-31.  See also Miller-El v. Dretke, 545 U.S. 231 (2005) (utilizing

14  comparative analysis, in a case in which a prima facie showing had been made, to determine

15  whether the prosecutor had been motived by racial bias in exercising peremptory challenges).[4]

16          On the other hand, the fact that a prosecutor's reasons may be "founded on

17  nothing more than a trial lawyer's instincts about a prospective juror" does not "diminish the

18  scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons

19  for the prosecutor's actions."  Power, 881 F.2d at 740 (quoting United States v. Chinchilla, 874

20  F.2d 695, 699 (9th Cir. 1989)).  "Excluding jurors because of their profession, or because they

21  acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly

22  within the prosecutor's prerogative."  United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir.

23  _____

24      [4] Comparative juror analysis refers to "an examination of a prosecutor's questions to
    prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise
25  similar jurors differently because of their membership in a particular group."  Boyd, 2006 WL
    3026021 at *5.  See also Miller-El, 125 S.Ct. at 2325 (stating that "side-by-side comparisons of
26  some black venire panelists who were struck and white panelists allowed to serve" was "more
    powerful" than bare statistics).

1   1987).  Rather, "[e]vidence in the record of objective reasons to strike a juror implies that racial

2   bias did not motivate the prosecutor."  Boyd v. Newland, 393 F.3d 1008, 1013 (9th Cir. 2004).

3   See also Paulino v. Castro, 371 F.3d 1083, 1091-92 (9th Cir. 2004) ("While we may consider

4   whether the record contains entirely plausible reasons, independent of race, why a prosecutor

5   may have exercised peremptories, such reasons have usually helped persuade us that defendant

6   made no prima facie showing where defendant challenged the excusal of just one juror.")

7          However, "implausible or fantastic justifications may (and probably will) be

8   found to be pretexts for purposeful discrimination."  Purkett, 514 U.S. at 768.  See also Lewis v.

9   Lewis, 321 F.3d 824, 830 (9th Cir. 2003) ("[I]f a review of the record undermines the

10  prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a

11  pretext for racial discrimination.")  In step three, the court "considers all the evidence to

12  determine whether the actual reason for the strike violated [petitioner's] equal protection rights."

13  Yee v. Duncan, 463 F.3d 893, 899 (9th Cir. 2006).  "A court need not find all nonracial reasons

14  pretextual in order to find racial discrimination."  Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir.

15  2006) (en banc).

16         Petitioner bears the burden of persuasion to prove the existence of unlawful

17  discrimination.  Batson, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts

18  from, the opponent of the strike.'"  Id. at 2417 (quoting Purkett, 514 U.S. at 768.  However,

19  petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory

20  challenges constitute a jury selection practice that permits 'those to discriminate who are of a

21  mind to discriminate.'"  Batson, 476 U.S. at 96 (quoting Avery v. Georgia, 345 U.S. 559, 562

22  (1953).

23         "Under AEDPA, however, a federal habeas court must find the state-court

24  conclusion 'an unreasonable determination of the facts in light of the evidence presented in the

25  State court proceeding."  Rice, 126 S.Ct. at 974, quoting 28 U.S.C. § 2254(d)(2).  "[A] federal

26  habeas court can only grant [habeas relief] if it was unreasonable to credit the prosecutor's race-

1   neutral explanations for the Batson challenge."  Rice, 126 S.Ct. at 974.  In determining whether a

2   state court's application of law or factual determination is "unreasonable," the court cannot

3   simply consider whether it would have reached a different outcome on the same record.  Rice,

4   126 S.Ct. at 974 (stating that "[r]easonable minds reviewing the record might disagree about" the

5   ultimate issue is insufficient for habeas relief).  "The 'unreasonable application' clause requires

6   the state court decision to be more than incorrect or erroneous."  Lockyer v. Andrade, 538 U.S.

7   63, 75 (2003).  Only if the evidence is "too powerful to conclude anything but" the contrary

8   should the district court grant relief.  Miller-El v. Dretke, 545 U.S. 231, 265 (2005).

9          At the first step of the Batson analysis, the undersigned finds that petitioner has

10  sufficiently alleged that he and the challenged jurors are members of a cognizable racial group

11  and will assume, for purposes of the present analysis, that petitioner made a prima facie case as

12  to each of the challenged jurors.

13         At the second step of the Batson analysis, and as previously discussed, the court

14  looks at the prosecutor's proffered reasons.  Here, the prosecutor provided numerous reasons for

15  challenging each of the prospective jurors.  Mr. Cusic was dismissed because he was sleeping

16  during voir dire and had recently been arrested by West Sacramento police officers.  Ms. Harris

17  was dismissed because she described profiling experience by the West Sacramento Police

18  Department.  Ms. Terrell was excused for two reasons.  First, she was witness to allegedly

19  improper actions by the Sacramento Police Department towards African American males and,

20  upon questioning, could not assure the court that she would be able to put aside those

21  experiences and be fair.  Additionally, the prosecutor was concerned with Ms. Terrell's "juror

22  remorse."  Mr. Gorham was excused in light of his negative contacts with law enforcement and

23  his general statement regarding African Americans being treated as "scapegoats" by society.

24  Finally, Mr. Richardson was excused because his brother's rape charges were pending, the

25  prosecutor's office was charging Mr. Richardson's brother, the brother was housed in the same

26  county jail as the defendants, Mr. Richardson had been pulled over by police at gunpoint, and

1   Mr. Richardson did not think the police did an adequate job of investigating a crime in which he

2   was the victim.

3         None of the reasons articulated by the prosecutor demonstrated inherent

4   discriminatory intent; thus, the reasons are deemed race-neutral.  Stubbs, 189 F.3d at 1105.

5   Accordingly, this court will proceed to the third step of the Batson analysis.

6         At the third step, the undersigned finds that petitioner failed to meet his burden to

7   demonstrate that the prosecutor's challenges were racially motivated.  The record supports the

8   prosecutor's reasons for challenging each of the jurors at issue here.  The record does not reflect

9   that the reasons proffered by the prosecutor for striking such jurors were pretextual.

10        Petitioner first argues that the African-Americans prospective jurors were

11  dismissed because they had negative experiences with law enforcement.  This argument,

12  however, is not supported by the record.  In fact, as discussed *supra*, the prosecutor provided

13  other reasons beyond negative experiences with law enforcement as to most of the challenged

14  jurors at issue here.  Further, although it is the petitioner's argument that most, if not all,

15  African-American have had some sort of negative experience with law enforcement and, thus,

16  dismissal for this reason constitutes group bias, petitioner has not presented any authority in

17  support.  To the contrary, it is well settled that a previous negative experience with law

18  enforcement or the judicial system constitutes an acceptable, race-neutral explanation for striking

19  a potential juror.  See Mitleider v. Hall, 391 F.3d 1039, 1048 (9th Cir. 2004).

20        Turning to a comparative juror analysis, the record reveals that the prosecutor did

21  not leave on the jury any non-African-Americans who were similarly situated.  Of those jurors

22  who remained on the jury panel, none slept during voir dire, as did Mr. Cusic; none relayed

23  considerable profiling experience by West Sacramento police officers, as did Ms. Harris; none

24  expressed juror remorse, which was a significant reason for the prosecutor's challenge of Ms.

25  Terrell; none made what the prosecutor called a "strong statement" that African-Americans are

26  society's "scapegoats," as Mr. Gorham did; and, lastly, none had a family member who was

being prosecuted by the prosecutor's office and who was housed in the same jail facility as the

defendants in that case, as Mr. Richardson did.  It is significant that the prosecutor did not

challenge Jurors # 4 and 11, both of whom were African-American and both of whom expressed

the belief on the juror questionnaire that African-American males are not treated fairly by law

enforcement and/or the judicial system.

Petitioner also alleges that the prosecutor questioned African-American

prospective jurors differently than the way he questioned white jurors so as to create pretextual

race-neutral reasons.  See Miller-El v. Dretke, 545 U.S. 231, 241 (2005).  Petitioner's argument

is premised on the jurors' answers to Questions 40 and 41 of the juror questionnaire.[5]  According

to petitioner, "correct" responses to these questions are "Fairly" to Question 40 and "No-No-

Yes-Yes" to Question 41, and "incorrect" responses are any other answers.  With this in mind,

petitioner argues that if a prospective juror gave an "incorrect" answer to Question 40 or 41, the

prosecutor would make an inquiry, but only if the prospective juror was African American.  In

contrast, argues petitioner, the prosecutor did not seek similar assurances from white prospective

jurors.

/////

---

[5]  For convenience, the questions are reproduced here:

    40.  In general, do you feel that African Americans are treated fairly or
unfairly by law enforcement in Sacramento?
            FAIRLY ___     UNFAIRLY ___

    41.  Do you feel that African American males:

          A.  Are unjustly accused of committing more crimes than other
persons?
              YES ___  NO ___
          B.  Are more likely to commit crimes than other persons?
              YES ___  NO ___
          C.  Are treated as fairly by law enforcement as other persons?
              YES ___  NO ___
          D.  Are treated fairly by the judicial system as other persons?
              YES ___  NO ___

1    The California appellate court did not address the merits of this argument.  (See

2  LD8 at 17.)  It relied on Miller-El v. Dretke, 537 U.S. 322 (2003), to find that an analysis of

3  disparate questioning is distinct from a comparative juror analysis and, since the former was not

4  raised in the trial court, the prosecutor was deprived of an opportunity to respond appropriately.

5  (Id. at 16-17.)

6    "On occasion, the manner in which the prosecutor questions potential jurors will

7  aid the Court's determination of whether the race-neutral explanation was pretextual."  Love v.

8  Scribner, 2010 WL 582034, *31 (S.D. Cal. 2010).  "Disparate questioning may create the

9  appearance of divergent opinions even though the venire members' views on the relevant subject

10  might have been the same."  Miller-El, 537 U.S. at 344 (considering comparative juror analysis,

11  disparate questioning and a history of discrimination to find the prosecutor's reasons for

12  dismissal to be pretextual).  Disparate questioning is circumstantial evidence that can show

13  discrimination.  See, e.g., Cook v. LeMarque, 593 F.3d 810 (9th Cir. 2010) (finding that

14  disparate questioning and a comparative juror analysis supported the court's conclusion that the

15  prosecutor's stated justifications were mere pretext); Bush v. Pliler, 268 Fed. Appx. 577, 579

16  (9th Cir. 2008) (unpublished) (distinguishing between evidence of disparate questioning and

17  evidence from a comparative juror analysis to show pretext).

18    Assuming for purposes of this analysis that petitioner did raise the issue of

19  disparate questioning in the trial court, the undersigned does not find petitioner's arguments to

20  be supported by the record.  As an initial matter, it is unclear whether petitioner is arguing that

21  the dismissed African-American prospective jurors should be compared to white or merely non-

22  African-American selected jurors.  While the record does not identify which of the selected

23  jurors were white, it has been established that of the twelve jurors and three alternates, two were

24  African-American.  Nonetheless, the responses of these jurors are summarized here.

25    Juror # 1 did not have an opinion as to Question 40 and, as to Question 41, stated

26  that he did not think that African American males are accused of committing more crimes or are

1   more likely to commit crimes than other persons. (LD3 at 2065.) He did not answer the

2   question whether African American males are treated as fairly by law enforcement as other

3   persons, but he did state that he thought the judicial system treated African American males as

4   fairly as others. (Id.)

5           Juror # 2 had no opinion as to Question 40. (LD3 at 2088.) In response to

6   Question 41, Juror # 2 did not think that African American males are unjustly accused of

7   committing more crimes than other persons and lacked knowledge as to the question whether

8   African American males are more likely to commit crimes than other persons. (Id.) Juror # 2

9   stated that African American males are treated as fairly by law enforcement and the judicial

10   system as others. (Id.)

11           Juror # 4, an African-American woman, wrote on the juror questionnaire that "I

12   feel that I might have some prejudice [against] some groups of people," and could not assure the

13   court that she would not allow the prejudice to affect the case. (LD3 at 2132.) Although Juror

14   # 4 stated in response to Question 40 that African Americans are treated "Fairly" by law

15   enforcement in Sacramento, she contradicted herself in Question 41 wherein she stated that she

16   did not think that law enforcement or the judicial system treated African American males as

17   fairly as other persons. (Id. at 2134.) Also in response to Question 41, she stated that she did not

18   think that African American males are accused of committing more crimes or are more likely to

19   commit crimes than other persons. (Id. at 2134.)

20           Juror # 5 stated on the juror questionnaire that he once had a negative experience

21   with law enforcement, but did not think that the experience would cause him to be unfair to

22   either side. (LD3 at 2156.) He did state overall positive feelings toward the Sacramento Police

23   Department. (Id.) Based on his experience, Juror #5 responded to Question 40 by stating that he

24   thought African Americans are treated "Fairly" by law enforcement: "From what I've have [*sic*]

25   read [and] seen African American males in Sacto are treated fairly." (Id. at 2157.) In response

26   to Question 41, Juror # 5 thought African American males are unjustly accused of committing

more crimes than other persons and did not think they are more likely to commit crimes than others.  (<u>Id.</u>)  He also did not think that African American males are treated fairly by law enforcement, but did think they are treated fairly by the judicial system.  (<u>Id.</u>)  Juror # 5 explained his responses to Question 41 as follows: "[A]ny answers are not based on actual experience, but on information I've have [*sic*] read from local [and] national papers [and] TV."  (<u>Id.</u>)

Juror # 8 did not have enough information to respond to Question 40.  (LD3 at 2226.)  In response to Question 41, Juror # 8 did not think that African American males are accused of committing more crimes or are more likely to commit crimes than other persons, and did think that they are treated as fairly by law enforcement and the judicial system as others.  (<u>Id.</u>)  Juror # 9 did not respond to either Question 40 or 41 based on lack of experience and/or knowledge.  (LD3 at 2249)

Juror # 11, an African American female, expressed positive feelings toward the Sacramento Police Department.  (<u>See</u> LD3 at 2294.)  In response to Question 40, Juror # 11 checked both "Fairly" and "Unfairly" and wrote, "As a women [*sic*] who is African American I feel that I'm treated fairly.  I'm not a [*sic*] African American man so I can't say."  (<u>Id.</u> at 2295.)  In response to Question 41, she stated she did not know enough to say whether African American males are unjustly accused of committing more crimes than others or whether they are treated fairly by the judicial system.  (<u>Id.</u>)  She did not, however, think African American males are more likely to commit crimes than other persons and did think that law enforcement does not treat them as fairly as others.  (<u>Id.</u>)

In response to Question 40, Alternate Juror # 13 stated "In general - fairly.  But I know of one instance where unfair treatment has occurred and have no doubt mistakes are made."  (LD3 at 2341.)  Alternate Juror # 13 stated s/he did not know whether African American males are unjustly accused of committing crimes than other persons; they are not more likely to commit crimes than other persons; are "not always" treated fairly by law enforcement as

compared to others; and are treated fairly by the judicial system.  (Id.)

Alternate Juror # 14 stated s/he "did not know" in response to Question 40 and to Question 41's subparts as to whether African American males are treated fairly by law enforcement and the judicial system.  (See LD3 at 2364.)  S/he did, however, state that African American males are not unjustly accused of committing more crimes than others and are not more likely to commit crimes than others.  (Id.)

Jurors # 3, 6, 7, 10 and 12 and Alternate Juror # 15 responded "correctly" to these questions.  That is, in response to question 40, they checked "Fairly."  (LD3 at 2111, 2180, 2203, 2272, 2318.)  In response to Question 41, none thought that African American males are accused of committing more crimes or are more likely to commit crimes than other persons, and all thought that African American males are treated as fairly by law enforcement and the judicial system as others.  (Id.)

Petitioner argues that of the thirteen non-African-American jurors, nine gave "incorrect" answers on the juror questionnaire and should have been questioned accordingly. The record, however, reveals that only two, not nine, of the thirteen non-African-American jurors, Juror # 5 and Alternate Juror # 13, expressed an opinion that African-Americans are not treated fairly by law enforcement and/or the judicial system.  The other jurors either did not respond to the questions, stated they did not have experience or information to answer the questions, or otherwise indicated that African-Americans are treated fairly, and, thus, gave no reason for the prosecutor to question them.  Notably, Juror # 4, an African American woman, expressed the opinion that African-Americans are treated unfairly, but she was not questioned by the prosecutor at all, and Juror # 11, also an African American, was questioned by the prosecutor about racial views, but was not challenged thereafter.  (See LD4 at 1070-72.)

Further, of the challenged prospective African-American jurors at issue here, the record reveals that the prosecutor initiated questioning of only two of the five on their responses to Questions 40 and 41: Mr. Cusic (LD4 at 1058) and Mr. Richardson (LD3 at 1414-17).

Defense counsel initiated questioning of Ms. Terrell regarding her answer to Question 40 with follow-up questioning by the prosecutor.  (LD3 at 917-18, 927-29.)  The trial court initiated questioning of Mr. Gorham regarding his response to Question 41 and both defense counsel and the prosecutor followed-up with further questions.  (See LD4 at 1113-16.)  Lastly, the trial court initiated questioning of Ms. Harris regarding her response to Question 41 with the prosecutor following-up.  (See LD4 at 1116-20.)

Finally, of the prospective non-African-American jurors who were eventually dismissed, the prosecutor questioned the following individuals who implied in their answers on the juror questionnaires or in response to questions by the trial court that they could not be fair or impartial: (1) Prospective Juror Padilla, who checked "Unfairly" in response to Question 40 (LD3 at 646-47); (2) Prospective Juror Santiago, who wrote that African-Americans are treated unfairly by law enforcement, are accused of committing more crimes than other persons, and are not treated fairly by the judicial system (LD3 at 310; 698-99); (3) Prospective Juror Ramon, who expressed distrust of law enforcement (LD3 at 899-900); (4) Prospective Juror Ford, who indicated on the juror questionnaire that she might be prejudiced for or against a person (LD3 at 934-35); (5) Prospective Juror Carmona, who relayed negative experiences with law enforcement (LD 1049-50); and (6) Prospective Juror Carter, who stated that African-Americans are not treated fairly by the criminal justice system (LD3 at 1509-10).  Based on the foregoing, the undersigned does not find a pattern of disparate questioning.

On this record, it was appropriate for the trial court to credit the prosecutor's race-neutral explanations and to decline to find purposeful racial discrimination in the jury selection.  Accordingly, this claim does not merit relief.

B.    Equal Protection Clause

Next, petitioner brings a claim on behalf of the African-American jurors who were challenged and argues that their individual equal protection rights were violated by the prosecutor's allegedly discriminatory use of peremptory challenges.

The California Court of Appeal addressed this claim as follows:

> Defendants have failed to establish that the trial court erred by sustaining the prosecutor's challenges. For this reason, their alternate claim that they may assert the challenged jurors' rights not to be subjected to racial bias as a denial of equal protection also fails, because they have not shown racial bias animated any of the challenges. To the extent defendants merely elaborate on their prior claims that their several *Wheeler-Batson* motions should have been granted, we reject the claims for the reasons already stated.

(LD8 at 26.)

Similarly, without addressing the issue of standing, the undersigned recommends that this claim be dismissed based on the finding that there was not racial discrimination.

C. <u>Jury Instructions</u>

Lastly, petitioner raises a Sixth and Fourteenth Amendment claim on the basis of the trial court's failure to give a jury instruction on the defense of unconsciousness. Petitioner also argues the trial court made improper character determinations.

1. <u>Factual Background</u>

In support of his contention that the evidence warranted the giving of instructions on unconsciousness, petitioner points to his testimony. On direct examination, petitioner testified that while approaching the location where the shooting occurred, he spotted a number of women and told the driver of the vehicle, "Stop the car, let me holler at these girls real quick." (LD2 at 841.) After talking to the women for a few minutes, petitioner noticed "a group of guys gathering together and coming toward us." (<u>Id.</u> at 842-44.) Petitioner testified that the group comprised of "no fewer than six," but "no more than nine" males. (<u>Id.</u> at 846.)

As the group started walking toward him, petitioner noticed that one had a red bandanna over his face, which the individual pulled down as he got closer. (LD2 at 853.) When they were approximately sixteen feet away from each other, petitioner recognized the individual as Marcus, someone with whom he had an altercation one week prior. (<u>Id.</u> at 853-54.) As the group was getting nearer, petitioner heard Marcus say, "What's up, Blood . . . yeah, we're going to get you now." (<u>Id.</u> at 855.) Defense counsel asked petitioner what he was thinking at this

time, to which petitioner responded:

> A.   Thinking, Dang, that's the dude that shot at me and that I punched.
>
> Q.   So what, how did that make you feel?
>
> A.   Right then, I was just, I was, I was stuck right then, I was nervous right then, I mean, I, I mean . . . as I noticed him, I was just like, Dang.

(LD2 at 858.)  Petitioner also testified that he recognized some of the other individuals who were walking toward him.  (Id. at 855-57.)

As the group got closer, the women with whom petitioner was speaking walked away towards the "north."  (LD2 at 858-59.)  After they left, petitioner "stood there" "kind of shell-shocked" as the group surrounded him.  (Id. at 859.)  At this time, petitioner saw Marcus reach down towards his waistband under an article of clothing.  (Id. at 861.)

> Q.   What did you do after one hand disappears under Marcus' clothing?
>
> A.   Pulled out my gun. [¶]
>
> Q.   With your right hand or left hand?
>
> A.   Left.

(Id. at 862.)  Petitioner stated he "held it straight out in the air because [he] wanted all of them to see it."  (Id. at 867.)  When asked what he hoped to accomplish by pulling out his gun, petitioner testified "I was hoping they would run away and let me go onto my car."  (Id. at 862.)

> Q.   Focusing on Marcus first, did you see any reaction by him after you took your gun out?
>
> A.   No.  When I took it out, everybody seen it. I can't say that everybody seen it, but when I pulled it out and held it up, um . . .
>
> Q.   Did something lead you to believe that people saw it?
>
> A.   Yeah.
>
> Q.   What's that?
>
> A.   A couple of them ran . . . [¶]

Q.      – what direction did you see them run?

A.      Um . . . well, I see one run north like toward the Hard Rock Café. .
        . . And . . . one run northwest like toward the mall, into the mall.

(Id.)

Of those who remained after he drew his gun, petitioner said they continued to circle him. (LD2 at 864.) At this point, petitioner stated he was "terrified" and that he "didn't know what to do." (Id.) He backed up "maybe two steps" "[t]oward 7th Street" before he shot the gun, "figur[ing] there wasn't nothing else to do . . . ." (Id. at 904-05.) Petitioner testified that he was "freaked out" and "in a state of shock" immediately upon firing the gun. (Id. at 911.) Even so, he was aware that his "feet stayed planted" while he was shooting. (Id. at 912.)

When he first discharged the gun, petitioner stated that Marcus "was in front of me or to the, little bit to the west of where I was standing." (LD2 at 905.) Petitioner also was aware of where the other individuals whom he recognized were standing. (See id. at 905-06.) After he fired the gun, petitioner saw Marcus turn and run "west from right where I was standing, west, straight west." (Id. at 907.) After everyone ran away, petitioner ran to his vehicle, put his gun in his pocket, entered through the front passenger door, and told the driver, "Let's go." (LD2 at 915.)

Petitioner also testified about his interactions with the police following the incident. (See id. at 920-26.) He stated that he lied to the first officer who interviewed him because he was "nervous," but then told the second officer voluntarily what occurred. (Id. at 922-24.) Petitioner told the second officer that he shot the gun "three, four times" and told him that he was "scared" and "didn't want to get beat up." (Id. at 924-25.)

In the proposed jury instructions, petitioner's counsel sought the inclusion of CALJIC 4.30 and 4.31, which instruct on the defense of unconsciousness. (See LD2 at 1534.) CALJIC 4.30 provides:

/////

1          A person who while unconscious commits what would otherwise be a
2   criminal act, is not guilty.

3          This rule of law applies to persons who are not conscious of acting but
   who performs acts while asleep or while suffering from a delirium of fever, or
4   because of an attack of [psychomotor] epilepsy, a blow on the head, the
   involuntary taking of drugs or the involuntary consumption of intoxicating liquor,
5   or any similar cause.

6          Unconsciousness does not require that a person be incapable of
   movement.

7          Evidence has been received which may tend to show that the defendant
   was unconscious at the time and place of the commission of the alleged crime for
8   which [he] [she] is here on trial.  If, after a consideration of all the evidence, you
   have a reasonable doubt that the defendant was conscious at the time the alleged
9   crime was committed, [he] [she] must be found not guilty.

10  (LD1 at 349.)  CALJIC 4.31, in turn, provides:

11         . . . If the evidence raises a reasonable doubt that the defendant was in fact
   conscious, you must find that [he] [she] was then unconscious.

12  (Id. at 350.)

13         Upon consideration, the trial court denied petitioner's request to give an

14  unconsciousness instruction.  (LD2 at 1534.)  The trial court found that petitioner was alert and

15  aware of the events as they were occurring and concluded that "he actually testified with a great

16  deal of specificity."  (Id. at 1535.)  It found that petitioner was aware that he first saw a group of

17  two people about sixteen feet away "and then another group of three individuals that were about

18  thirty-three feet away starting to join the group of two."  (Id.)  The court discussed petitioner's

19  memory of details about the individuals, including what they were wearing, where they were

20  standing relative to him, what they were saying, and who some of them were.  (Id. at 1535,

21  1537.)  Additionally, the court addressed petitioner's testimony wherein he testified as to what

22  direction each of the individuals ran after he began shooting.  (Id. at 1537-38.)  The trial court

23  also considered petitioner's statements to the police officer, in which he described his demeanor

24  and his standing posture while he was shooting the firearm.  (Id. at 1536.)

25  /////

26

43

The trial court summed up its findings as follows:

> Anyway, in light of his testimony, I find that, indeed, Mr. Scott does provide a great deal of detail as to what occurred and where people were standing and where they were, ran off to once the shots started. He may not know exactly what path they took but he certainly testified as to what direction they went in, a general direction.

> And, I think, given that this incident, it took a matter of seconds, that Mr. Scott's recollection and comprehension of what went on is quite detailed for this incident.

> And I certainly do accept the fact that Mr. Scott indicated that, well, that he was scared. And I know there's a statement that he gave to the officer that said he was scared, but not scared, but he didn't want to be beat up, but, at least, here int rial he testified that he was terrified and scared. But despite being scared and terrified, he was able to give distances and positions of individuals and even say in what direction people ran.

> So, based on all that, I find that Mr. Scott was aware of his actions on this particular day based on his testimony.

> And so I just find that there's just been . . . insufficient evidence provided int his trial to show that he was in such a state of shock to be unaware of his actions of what occurred.

(LD2 at 1539-40.)

### 2. State Court Decision

The last reasoned decision with respect to this claim is the opinion of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal. The Court of Appeal explained the facts surrounding this claim and its legal analysis as follows:

> Based on Scott's testimony about his mental state at the time of the shootings, defendants contend the trial court should have instructed the jury that unconsciousness was a complete defense. (Pen. Code, § 26, subd. Four.)

> We begin by addressing a few preliminary points.

> First, defendants fault the People for not replying to their assertion that they were entitled to the instruction *if* they relied on the defense *or* there was substantial evidence to support it. The People replied by citing authority for the proposition that "the trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*." (*People v. Miceli* (2002) 104 Cal. App. 4th 256, 267, italics added (*Miceli*); see *In re Christian S.* (1994) 7 Cal.4th 768, 783.) This court has recently concluded that despite occasional repetitions in published cases of the disjunctive test sought by defendants, it is not the law and a defendant is entitled to an instruction on a

defense only where substantial evidence supports it.  (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1046, 1058-1059 (*Shelmire*).)  Although as this court explained in *People v. Adrian* (1982) 135 Cal.App.3d 335, at pages 338 to 330, a defendant may try to raise a reasonable doubt by use of an instruction which tethers specific evidence to a defense theory, a trial court may reject such an instruction *if no substantial evidence supports that theory.*  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100.)

Second, defendants fault the trial court for making factual findings about Scott's mental state during the shootings; that is, they contend the trial weighed the strength of the evidence of unconsciousness, thereby usurping the jury's role. We agree that in determining whether the evidence supports a defense instruction, "the court should not consider the credibility of witnesses, instead leaving credibility determinations for the jury."  (*People v. Elize* (1999) 71 Cal.App.4th 605, 615.)  We disagree that the trial court resolved credibility issues in this case. The trial court, in discussing whether the evidence was sufficient to support the instruction, reviewed the evidence in detail.  In the course of that discussion, she made a few comments such as "I find that Mr Scott was aware of what was occurring," and "I certainly to accept the fact that . . . he was scared," but these passages, read in context, do not show that the trial court was usurping the jury's role, only that she was evaluating whether there was sufficient evidence to warrant giving the instruction–which was exactly what she was supposed to do before instructing on the defense (see *Shelmire*, *supra*, 130 Cal.App.4th 1044). When the parties discussed the instructions later, the trial court made it clear that she had concluded the evidence did not support giving the instruction.  This accords with our reading of the earlier passages and therefore we reject the claim that the trial court improperly resolved factual issues, instead of identifying factual issues.

"On review, we determine independently whether substantial evidence to support a defense existed."  (*Shelmire, supra*, 130 Cal.App.4th at p. 1055.)  Thus, we must examine what evidence is needed to establish a defense, then assess the trial evidence.

The requested instructions would have told the jury that "A person who while unconscious commits what would otherwise be a criminal act, is not guilty of a crime. [¶] This rule of law applies to persons who are not conscious of acting but who perform acts while asleep or while suffering from a delirium of fever, or because of an attack of [psychomotor] epilepsy, a blow on the head, the involuntary taking of drugs or the involuntary consumption of intoxicating liquor, or any similar cause. [¶] Unconsciousness does not require that a person be incapable of movement."  (CALJIC No. 4.30.)  The jury would also have been told to presume defendant was conscious if he had acted as if he were, but "If the evidence raises a reasonable doubt that the defendant was in fact conscious, you must find that [he] [she] was then unconscious."  (CALJIC No. 4.31.)

To warrant such instruction it is not enough that a person is befuddled or loses memory, the defense requires evidence raising a doubt about the actor's awareness.  (Pen. Code, § 26, subd. Four ["without being conscious thereof"]; see generally 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, §§ 31-32.)

Viewing the evidence in the light favorable to Scott, we uphold the trial court's rejection of the defense instructions.

Scott testified that his prior head wound did *not* cause brain damage or affect his thinking.  (See *People v. Heffington* (1973) 32 Cal. App.3d 1, 8-10 [evidence of mental changes after head injuries was not linked to evidence of "loss of awareness"; no instruction required].)  He offered no evidence of unconsciousness due to involuntary consumption of intoxicants (see *People v. Conley* (1966) 64 Cal.2d 310, 323-324 [*voluntary* intoxication does not trigger the defense]) nor evidence explaining how the circumstances he faced that evening could have caused some sort of acute mental incapacity.  To the contrary, all he offered was a brief loss of memory, apparently due to the stress and fear he experienced.  That does not equate to loss of consciousness.  (See *People v. Kozel* (1982) 133 Cal.App.3d 507, 526 (Kozel remembered details leading up to firing his pistol, but he lost memory thereafter; held, trial court properly refuse to instruct on unconsciousness].)

Before the shooting, Scott recognized Marcus and others in the group approaching him, and because of the prior Welcome Grove incident felt fear; this fear was exacerbated when he saw Marcus lower a bandanna, make a threatening statement and reach near his waist.  Scott testified he had not walked away before that happened because he was "kind of shell-shocked" and "froze."  He displayed his gun, which drove off two of the men, then he fired into the air to further deter an attack.  Despite Scott's use in testimony of the terms "shell-shocked" and "froze[n]," his testimony as a whole shows he was conscious up to this point and was making rational decisions to protect himself from attack.

Scott testified that when he fired into the air he "was kind of freaked out" and "in a state of shock" and he could not remember how many shots he fired.  But he saw Marcus run to the west and saw Jamari, Rasheem and Jones leave, though he did not know where.  When he stopped hearing shots he rain to the car and told McPherson, "Let's go."

To rebut the apparent effort to show a transient unconsciousness during the precise time that the subsequent shots were fired, the prosecutor asked Scott if he had "black[ed] out," and Scott replied that he was "freaked out" and thought "I'm going to die or I'm going to get to the car or I'm going to get away from here, you know."  This shows that Scott was *scared*, not that he was *oblivious*, and in fact shows he was still *thinking* and therefore aware.

On redirect Scott stated, "as I was shooting . . . it was kind [of] a blank out, something like that;" "it was a reaction to me knowing . . . I got to get away from here, you know."  "[M]y mind state wasn't even stable enough . . . to focus on shooting any particular person . . . ."  But even in this testimony, despite the vague reference to "blank out," Scott did not testify that he was unaware of what was happening, only that he could not remember clearly what had happened.  He still conveyed the idea that he knew he had "to get away" even if he was not "focus[sed] on shooting any particular person[.]"  He was conscious.

The principal cases relied on by defendants–*Bridgehouse* and *Wilson*–applied a former rule to the effect that if there was *any* evidence

46

whatsoever supporting a defense, no matter how feeble, instruction thereon was required.  (*People v. Modesto* (1963) 59 Cal.2d 722, 729; *People v. Carmen* (1951) 36 Cal.2d 768.)  As stated, the present rule is that a "defendant is entitled to instruction on request on any defense for which substantial evidence exists."  (*Miceli*, *supra*, 104Cal.App.4th at p. 267; see *People v. Flannel* (1979) 25 Cal.3d 66, 684-685 & fn. 12.) . . .

Moreover, any error was harmless.  While pressing for a different standard, defendants acknowledge authority holding that the state-law standard of prejudice applies to "misdirection of the jury," citing *People v. Breverman* (1998) 19 Cal.4th 142 (see *id.* at pp. 176-178).  The alleged error did not relieve the jury of the need to find Scott acted intentionally, and therefore did not "effectively prevent the jury from finding that the prosecution failed to prove a particular element of the crime beyond a reasonable doubt" such that the harmless beyond a reasonable doubt standard of prejudice would apply.  (See *People v. Floor* (1998) 18 Cal.4th 470, 491.)

Scott's story was incredible and contradicted several witnesses with no motive to lie.  Further, the instructions given show *the jury necessarily found he retained consciousness*.  The verdicts on the attempted murder counts show Scott had "a specific intent to kill" those victims.  The verdicts on the assault counts show Scott "willfully," "intentionally," assaulted the victims and "was aware of facts that would lead a reasonable person" to realize the probable result would be to apply force to those victims.  The firearm allegations show the jury found Scott "intentionally" used his gun.  These findings negate unconsciousness.  (*People v. Simington* (1993) 19 Cal.App.4th 1374, 1381; see *People v. Cunningham* (2001) 25 Cal.4th 926, 1008.)

(LD8 at 27-33.)

3.  Analysis

As a general rule, federal habeas corpus relief is only available for an alleged error in jury instructions when the instructional error "'so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  A habeas petitioner has an "especially heavy" burden "[w]here the alleged error is the failure to give an instruction."  Hendricks v. Vasquez, 974 F.2d 1099, 1106 (9th Cir. 1992) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

Due process requires that criminal prosecutions "comport with prevailing notions of fundamental fairness" and that "criminal defendants be afforded a meaningful opportunity to present a complete defense."  California v. Trombetta, 467 U.S. 479 at 485 (1984).  When habeas is sought under 28 U .S.C. § 2254, "[f]ailure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable."  Beardslee v. Woodford, 358 F .3d 560, 577 (9th Cir. 2004) (as amended); see also Bradley

47

1    v. Duncan, 315 F.3d 1091, 1098 (9th Cir. 2002) ("[T]he right to present a defense
2    would be empty if it did not entail the further right to an instruction that allowed
     the jury to consider the defense.") (internal quotation marks omitted); Conde v.
3    Henry, 198 F.3d 734, 739 (9th Cir. 2000) (as amended) ("It is well established
     that a criminal defendant is entitled to adequate instructions on the defense theory
4    of the case."). A habeas petitioner must show that the alleged instructional error
     "had substantial and injurious effect or influence in determining the jury's
5    verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted); see
     also Beardslee, 358 F.3d at 578.

6    Clark v. Brown, 450 F.3d 989, 904-905 (9th Cir. 2006). See also Byrd v. Lewis, 566 F.3d 855,

7    860 (9th Cir. 2009).

8          A defendant is entitled to a jury instruction only if there is substantial evidence

9    supporting that instruction. People v. Stitely, 35 Cal.4th 514, 552 (Cal. 2005). Under California

10   law, "unconsciousness, if not induced by voluntary intoxication, is a complete defense to a

11   criminal charge." People v. Halvorsen, 42 Cal.4th 379, 417 (Cal. 2007) (internal citations

12   omitted). To constitute a defense, unconsciousness need not rise to the level of coma or inability

13   to walk or perform manual movements; it can exist " where the subject physically acts but is not,

14   at the time, conscious of acting." Id.

15         As an initial matter, the undersigned does not find that the trial court made

16   improper character determinations. Rather, the record reflects the trial court's detailed

17   description of petitioner's testimony and a determination as to whether there existed "substantial

18   evidence" for the inclusion of the contested jury instructions. After review of the record, this

19   court finds that the state court of appeal's determination that there was insufficient evidence to

20   support the requested instructions is supported by the record. In particular, the state court found

21   that petitioner was able to provide highly specific details of the incident, including (1) the

22   positions of the individuals surrounding him, (2) their identities, (3) his thought-process during

23   the incident, (4) in which hand he held the gun, (5) how many steps back he took and in what

24   direction he walked while holding the gun; and, finally, (6) what directions the individuals in the

25   group ran after he fired the gun.

26   /////

1    These findings are fully supported by the record and an accurate characterization

2  thereof.  The state court's rejection of this claim was entirely congruent with controlling

3  principles of federal law. This claim should be denied.

4    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

5  a writ of habeas corpus be denied.

6    These findings and recommendations are submitted to the United States District

7  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

8  days after being served with these findings and recommendations, any party may file written

9  objections with the court and serve a copy on all parties.  Such a document should be captioned

10 "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

11 objections shall be filed and served within fourteen days after service of the objections.  The

12 parties are advised that failure to file objections within the specified time may waive the right to

13 appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14 DATED: May 5, 2010.

16                                    UNITED STATES MAGISTRATE JUDGE

18 /014;scot2729.157